**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JESUS A. CRUZ, JR., Plaintiff, v. UNITED COLLECTION BUREAU, INC., Defendants. | Case No.: 3:24-cv-02172-DMS-JLB **ORDER (1) GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND (2) GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR PARTIAL SUMMARY ADJUDICATION** |

On November 19, 2024, Plaintiff Jesus Cruz filed this action against Defendant United Collection Bureau, Inc. ("UCB"). (Compl. 1, ECF No. 1.) Cruz alleges that UCB engaged in unlawful debt collection practices in violation of the Fair Debt Collection Practices Act ("FDCPA"), the Rosenthal Fair Debt Collection Practices Act ("RFDCPA"), and the Telephone Consumer Protection Act ("TCPA"). (*Id.* at 1–2.) Cruz filed a motion for partial summary adjudication and UCB filed an opposing motion for summary judgment, both of which are pending before the Court. (Pl.'s Mot. Partial Summ. J., ECF No. 37 [hereinafter Pl.'s Mot.]; Def.'s Mot. Summ. J., ECF No. 33 [hereinafter Def.'s Mot.].) Each party filed an opposition and a reply. (Pl.'s Opp'n Def.'s Mot., ECF No. 46 [hereinafter Pl.'s Opp'n]; Def.'s Reply Pl.'s Opp'n, ECF No. 48 [hereinafter Def.'s Reply]; Def.'s Opp'n Pl.'s Mot., ECF No. 42 [hereinafter Def.'s Opp'n]; Pl.'s Reply Def.'s Opp'n, ECF No. 50 [hereinafter Pl.'s Reply].) For the reasons discussed below, the Court grants

in part and denies in part each party's motion for summary judgment.

## I. BACKGROUND

Cruz had an account with Citibank, N.A., that became delinquent. (Cruz Decl. Supp. Pl.'s Mot. ¶¶ 2–3, ECF No. 37-2.) Citibank placed the account with UCB for collection. (Def.'s Separate Statement Supp. Def.'s Mot. 2, ECF No. 34.) On October 5, 2023, Cruz's counsel prepared a letter addressed to UCB at 5620 Southwyck Boulevard, Toledo, Ohio 43614 [hereinafter the Letter]. (Ex. 7 Decl. Att'y Ahren A. Tiller Supp. Pl.'s Mot., ECF No. 37-10 [hereinafter Tiller Decl.].) The Letter stated that counsel represented Cruz with respect to any debt owed to and/or serviced by UCB, directed UCB to stop communicating with Cruz and to direct further communications to counsel, and revoked any consent to be contacted by phone, including by calls using a prerecorded or automated voice message. (*Id.*) Cruz's counsel transmitted the Letter to Docsmit, a third-party vendor, for mailing by First-Class Mail. (Tiller Decl. ¶ 8, ECF No. 37-3.) Docsmit deposited the Letter in the mail on October 6, 2023. (*See* Def.'s Separate Statement Supp. Def.'s Mot. 4.) The Docsmit tracing data records two scans of the Letter on October 12, 2023, in ZIP code 43601, under op codes 918 and 919, and no later scans. (Ex. 8 Tiller Decl., ECF No. 37-11.)

UCB maintains that it never received the Letter. (Decl. Michelle S. Velasco Supp. Def.'s Mot. ¶ 20, ECF No. 33-2 [hereinafter Velasco Decl.].) Michelle Velasco, UCB's Director of Compliance and Fed. R. Civ. P. 30(b)(6) designee, testified that UCB reviewed the notes on Cruz's account and searched its incoming mail records for October 2023 but located no record of receiving the Letter. (Ex. 3 Decl. Sean P. Flynn Supp. Def.'s Mot. 64:2–19, 65:12–14, ECF No. 33-1 [hereinafter Flynn Decl.].) UCB continued to call Cruz after his counsel sent the Letter. (*See* Ex. 12 Tiller Decl., ECF No. 37-15.)

UCB used a telephone system called LiveVox HCI on Cruz's account. (Velasco Decl. ¶ 10.) According to Velasco, UCB does not use artificial or prerecorded voices on Citibank accounts and used none on Cruz's account. (*Id.* ¶¶ 12–13.) Cruz declared that calls he answered began with a pause or delay, that some of the voicemails UCB left

appeared to be identical scripted messages, and that the calls were prerecorded rather than placed by a live agent. (Cruz Decl. Supp. Pl.'s Mot. ¶ 8.)

## II. LEGAL STANDARD

Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party has the initial burden of demonstrating that summary judgment is proper. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). The moving party must identify the pleadings, depositions, affidavits, or other evidence that it "believes demonstrates the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "A material issue of fact is one that affects the outcome of the litigation and requires a trial to resolve the parties' differing versions of the truth." *S.E.C. v. Seaboard Corp.*, 677 F.2d 1301, 1306 (9th Cir. 1982).

The burden then shifts to the opposing party to show that summary judgment is not appropriate. *Celotex*, 477 U.S. at 324. The opposing party's evidence is to be believed, and all justifiable inferences are to be drawn in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). However, to avoid summary judgment, the opposing party cannot rest solely on conclusory allegations. *Berg v. Kincheloe*, 794 F.2d 457, 459 (9th Cir. 1986). Instead, it must designate specific facts showing there is a genuine issue for trial. *Id.*; *see also Butler v. San Diego District Attorney's Office*, 370 F.3d 956, 958 (9th Cir. 2004) (stating if defendant produces enough evidence to require plaintiff to go beyond pleadings, plaintiff must counter by producing evidence of his own). More than a "metaphysical doubt" is required to establish a genuine issue of material fact. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

## III. DISCUSSION

### A. Alleged FDCPA and RFDCPA Violations

An FDCPA plaintiff must prove: "(1) plaintiff has been the object of collection activity arising from a consumer debt; (2) the defendant qualifies as a 'debt collector' under the FDCPA; and (3) the defendant has engaged in a prohibited act or has failed to perform

a requirement imposed by the FDCPA." *Dang v. CitiMortgage, Inc.*, No. 5:11-CV-05036 EJD, 2012 WL 762329, at *3 (N.D. Cal. Mar. 7, 2012) (citations omitted). The RFDCPA "mimics" the FDCPA's requirements and thus has similar elements. *See Riggs v. Prober & Raphael*, 681 F.3d 1097, 1100 (9th Cir. 2012) ("The [RFDCPA] mimics or incorporates by reference the FDCPA's requirements . . . and makes available the FDCPA's remedies for violations."); see also *Long v. Nationwide Legal File & Serve, Inc.*, No. 12-CV-03578-LHK, 2013 WL 5219053, at *17 (N.D. Cal. Sept. 17, 2013) (noting that RDCPA has same elements as FDCPA). The first two elements are undisputed, so the Court grants summary judgment to Cruz on them. (*See* Def.'s Opp'n 1.) The parties dispute element (3): whether UCB has engaged in a prohibited act or has failed to perform a requirement imposed by the FDCPA and RFDCPA.

**1. Alleged Violations of 15 U.S.C. § 1692c(a)(2) and Cal. Civ. Code § 1788.14(c)**

The FDCPA provides that "a debt collector may not communicate with a consumer in connection with the collection of any debt . . . if the debt collector knows the consumer is represented by an attorney with respect to such debt . . . ." 15 U.S.C. § 1692c(a). The RFDCPA contains a similar provision barring debt collectors from "[i]nitiating communications, other than statements of account, with the debtor with regard to the covered debt, when the debt collector has been previously notified in writing by the debtor's attorney that the debtor is represented by the attorney with respect to the covered debt . . . ." Cal. Civ. Code § 1788.14.

Courts generally interpret 15 U.S.C. § 1692c(a)(2) "to require that a debt collector have 'actual knowledge' of attorney representation with respect to the specific debts." *See Woodman v. Medicredit, Inc.*, No. 2:22-CV-1210 JCM (BNW), 2024 WL 4132732, at *3 (D. Nev. Sept. 9, 2024) (citations omitted). "This interpretation is consistent with the plain language of the statute referring to 'such debt.'" *Id.* (quoting 15 U.S.C. § 1692c(a)(2)). The parties dispute whether UCB received the October 5, 2023 cease-and-desist letter from Cruz's counsel. If UCB did not get the Letter, UCB would lack knowledge of Cruz's representation under the FDCPA and would not have been previously notified in writing

of his representation under the RFDCPA.[1] If UCB got the Letter, it likely violated both statutes. For the reasons stated below, the Court denies each party's motion for summary judgment.

**a. Alleged Affirmative Proof of Delivery**

Cruz argues that the Docsmit tracing data[2] affirmatively proves delivery. (Pl.'s Mot. 9.) The Court disagrees. Cruz first argues that the presence of op codes 918 and 919 mean that "the Letter completed carrier-sequence sorting and was positioned for same-day or next-day delivery on October 12, 2023." (*Id.* at 10.) Cruz then argues that if the Letter had been undeliverable, returned to sender, or forwarded, the USPS would have generated a negative scan code. (*Id.*) Cruz gestures at the USPS IMb Tracing User Guide to support this assertion without citing any specific section. (*See id.*)

But the Guide undercuts Cruz's argument. The Guide states that when interpreting scan data, readers should consider the fact that "due to the nature of mail processing there is no guarantee that a mailpiece will receive a scan." (Ex. 14 Tiller Decl. 24, ECF No. 37-17.) Further, mailpieces that are not processed on mail processing equipment do not generate IMb Tracing scan data at all. (*Id.* at 5.) Cruz offers no evidence on how often mailpieces are processed without mail processing equipment or do not get scanned even when using mail processing equipment. (*See* Pl.'s Mot. 9–11.) Therefore, there is no way

---

[1] Cruz argues that UCB could have been notified under Cal. Civ. Code § 1788.14(c) even if UCB did not receive the Letter. (Pl.'s Opp'n 18.) But he points to no authority supporting this proposition, and it contradicts the statute's plain text. (*See id.*)

[2] UCB argues that this data "should be stricken from the record in its entirety" for noncompliance with 28 U.S.C. § 1746. (Def.'s Reply 1 (asking the Court to strike Ex. 8 Suppl. Decl. Att'y Ahren A. Tiller Supp. Pl.'s Opp'n [hereinafter Tiller Decl. 2], ECF No. 46-11).) But UCB mischaracterizes Exhibit 8. Exhibit 8 is not a "declaration, certificate, verification, or statement" within the meaning of 28 U.S.C. § 1746. Rather, it is an exhibit attached to a declaration that does, in fact, comply with 28 U.S.C. § 1746. (*Compare* Tiller Decl. 2 at 7, 11, ECF No. 46-2 *with Burns v. Koudelka Transp. LLC*, 754 F. Supp. 3d 1014, 1021 (D. Idaho 2024) (declining to consider exhibits attached to declaration *not* signed under penalty of perjury).) Further, UCB itself relies on the Docsmit tracing data in its motion for summary judgment, (Def.'s Mot. 10), and "a party may not defeat summary judgment by disputing its own evidence." *Cf. Beyond Sys., Inc. v. Kraft Foods, Inc.*, 972 F. Supp. 2d 748, 771 (D. Md. 2013). Accordingly, the Court overrules UCB's objection.

to know the likelihood of a negative scan code had the Letter been undeliverable, returned to sender, or forwarded. The Letter's tracing data shows only op codes 918 and 919 with no subsequent entries. (Ex. 8 Tiller Decl.) Therefore, even assuming Cruz correctly characterized op codes 918 and 919, the record before the Court is equally consistent with delivery and nondelivery. Drawing all inferences in UCB's favor in evaluating Cruz's motion for summary judgment, the Court denies summary judgment to Cruz on the theory that the Docsmit tracing data affirmatively proves delivery.[3]

**b. Mailbox Rule**

"The mailbox rule provides that the proper and timely mailing of a document raises a rebuttable presumption that the document has been received by the addressee in the usual time." *Schikore v. BankAmerica Supplemental Ret. Plan*, 269 F.3d 956, 961 (9th Cir. 2001). The rule "is a settled feature of the federal common law." *Id.* "[I]t is a tool for determining, in the face of inconclusive evidence, whether or not receipt has actually been accomplished." *Id.* The factfinder must first determine whether the party claiming the benefit of the presumption "has produced sufficient evidence of mailing" to invoke it. *Id.* at 963. The factfinder must then determine whether the party opposing the presumption "has presented sufficient evidence of non-receipt" to rebut it. *Id.*

Sufficient evidence of mailing is established by proof that a letter was (1) properly directed and (2) placed in a post office. *Hagner v. United States*, 285 U.S. 427, 430 (1932). Here, the Letter was addressed to UCB at 5620 Southwyck Boulevard, Toledo, Ohio 43614. (Ex. 7 Tiller Decl. Supp. Pl.'s Opp'n, ECF No. 46-10.) UCB's own Fed. R. Civ. P. 30(b)(6) designee, Director of Compliance Michelle Velasco, conceded that 5620 Southwyck is the correct address to send mail to UCB. (Def.'s Reply Pl.'s Separate Resp.

---

[3] Similarly, UCB argues that the absence of USPS mail codes that allegedly "would have reflected delivery" is conclusive proof of *non*-delivery. (Def.'s Mot. 10.) But this argument is doomed for the same reasons as Cruz's argument here: the record is equally consistent with delivery and nondelivery and must be construed against the moving party. UCB's code-based argument that the letter never left an upstream distribution center fails for the same reasons. (*See id.*)

Def.'s Statement Undisputed Material Facts 17, ECF No. 49 (citation omitted).) UCB further concedes that 5620 Southwyck is its "physical address." (Ex. 3 Tiller Decl. 4–5, ECF No. 37-6.) UCB's own website states, "To contact us via mail, please send all documentation to" 5620 Southwyck. *Contact*, https://ucbinc.com/contact/ (last visited Sept. 9, 2026); *see also* Def.'s Reply Pl.'s Separate Resp. Def.'s Statement Undisputed Material Facts 17 (same). Finally, UCB concedes that 5620 Southwyck "appears on UCB's own corporate letterhead and return address used on UCB's collection letters to Plaintiff." (Def.'s Reply Pl.'s Separate Resp. Def.'s Statement Undisputed Material Facts 17.) Therefore, the Court finds that the Letter was properly directed and addressed.

Further, the Court finds that the Letter was placed in a post office. Cruz's counsel sent the Letter to Docsmit for mailing to UCB. (Tiller Decl. 5–6.) The Docsmit tracing data shows that tracking number 00270200802191544826 was "Provided to Postal Processing Facility" on October 6, 2023. (Ex. 8 Tiller Decl.) Tracking number 00270200802191544826 belongs to the Letter. (Tiller Decl. 5–7.) UCB does not seriously contest this element, conceding that "On October 5, 2023, Plaintiff's Counsel drafted a letter to UCB. Plaintiff's Counsel sent the letter to Docsmit to be sent to UCB"; that "Docsmit deposited a letter in the mail on October 6, 2023"; and that "The letter arrived in Toledo, Ohio *at a post office location* . . . ." (Def.'s Separate Statement Supp. Def.'s Mot. 4.) Therefore, even relying only on UCB's admissions, Cruz properly directed his letter and placed it in a post office, entitling him to the mailbox rule presumption. *See Hagner*, 285 U.S. at 430.

However, UCB can successfully rebut the presumption. The Ninth Circuit established in *Schikore* that the party seeking to rebut the presumption must, at minimum, (1) describe in detail its procedures for receiving, sorting, and distributing mail, (2) show that these procedures were properly followed at the time when the document in question might conceivably have been delivered by the postal service, (3) provide evidence that it has conducted a thorough search for the document at the addressee's physical facility, and

(4) establish that had the document been received around the time the claimant asserted it was mailed, it would presently be at the location searched.[4]

First, UCB has described in detail its procedures for receiving, sorting, and distributing mail. (*See, e.g.*, Def.'s Separate Statement Supp. Def.'s Mot. 5–6 (outlining extensive evidence of mail procedures[5]).) Second, it has shown that it properly followed these procedures at the time when the Letter might conceivably have been delivered by the postal service. (*See, e.g.*, Ex. 3 Flynn Decl. 47:14–55:19 (outlining October 2023 procedures).) Third, UCB conducted a thorough search for the Letter. UCB reviewed the notes on Cruz's account and any accompanying email communications. (*Id.* at 64:6–19.) UCB also searched its incoming mail records for October of 2023. (*Id.* at 65:12–14.) These search efforts closely resemble those that courts applying the *Schikore* test have deemed satisfactory. *See Piper v. CVS Pharmacy, Inc.*, No. SACV 20-01626-CJC(DFMX), 2021 WL 12368936, at *3 (C.D. Cal. Jan. 5, 2021) (presumption rebutted where defendant employer reviewed employee's records and letter tracker); *Miranda v. Shellpoint Mortg. Servicing LLC (In re Miranda)*, 2021 Bankr. LEXIS 2311, *34 (2021) (presumption rebutted where document was not reflected in communications record or internal notes). Finally, UCB has established that had the Letter been received around the time Cruz asserted it was mailed, it would presently be at the locations searched. Velasco's testimony shows that had the Letter been received in October of 2023, it would have been captured

---

[4] 269 F.3d at 964. The panel developed this test for the ERISA context, keeping in mind ERISA's "purpose to protect employee rights." *Id.* However, the parties and the Court agree that *Schikore*'s four-part test also controls here. (*See, e.g.*, Def.'s Mot. 9; Pl.'s Reply 5.) Courts regularly apply the *Schikore* test outside of the ERISA context. *See, e.g.*, *Lee v. Cnty. of Los Angeles*, No. 2:23-CV-06875-GW-MAA, 2025 WL 2505484, at *13 (C.D. Cal. Aug. 29, 2025). Further, the Court finds that the FDCPA's purpose of "protect[ing] consumers from abusive, harassing, threatening, misleading and otherwise unscrupulous debt collection practices" is sufficiently similar to ERISA's purpose to protect employee rights to apply the test here. *See Leone v. Ashwood Fin., Inc.*, 257 F.R.D. 343, 347 (E.D.N.Y. 2009); *see also Davidson v. Seterus, Inc.*, 21 Cal. App. 5th 283, 295 (2018) (quoting Cal. Civ. Code § 1788.1) (noting similar purpose for the RFDCPA).

[5] Cruz argues that "UCB never produced its claimed handling procedures during the discovery period." (Pl.'s Separate Resp. Def.'s Statement Undisputed Material Facts 11, ECF No. 46-3.) But the Court would reach the same result using Velasco's testimony alone.

in Cruz's account notes and the accompanying account notes and correspondence log. (Ex. 3 Flynn Decl. 47:14–55:19.)

Cruz responds that UCB "conducted no physical search of UCB's incoming mail bins or carrier route bundles, performed no audit of October 2023 mail handling for the Citibank portfolio assigned accounts, and has 'no' affirmative evidence of non-delivery." (Pl.'s Opp'n 10 (citation omitted).) In support, Cruz cites a portion of Velasco's deposition that establishes only that UCB had not "located any record of receiving a cease and desist letter from plaintiff's counsel on or around October 5, 2023." (Ex. 5 Tiller Decl. 64:1–10, ECF No. 37-8.) Even if Cruz had correctly characterized Velasco's testimony, nothing in *Schikore* required UCB to follow his suggested steps above to rebut the presumption. *See* 269 F.3d at 964; *Piper*, 2021 WL 12368936, at *3; *In re Miranda*, 2021 Bankr. LEXIS 2311, *34. *Schikore* requires only a "thorough search," not that the recipient company audit its entire mail handling program. *See* 269 F.3d at 964; *Piper*, 2021 WL 12368936, at *3; *In re Miranda*, 2021 Bankr. LEXIS 2311, *34. Further, Cruz's assertion that "UCB's mail-handling procedures, as described, would have logged the Letter if those procedures were actually followed" is circular, and would render the presumption irrebuttable any time a letter was not received. (*See* Pl.'s Opp'n 15.) Therefore, the Court finds that UCB has successfully rebutted the presumption.[6]

However, UCB is incorrect that successfully rebutting the presumption means it is entitled to summary judgment. Even if the presumption is rebutted, a genuine dispute can exist as to whether a letter was received, making summary judgment inappropriate. *Bd. of Trs. of California Winery Workers' Pension Tr. Fund v. Giumarra Vineyards*, No. 1:17-CV-00364-SAB, 2018 WL 1155988, at *10 (E.D. Cal. Mar. 2, 2018) (citing *Heydarian v.*

[6] Cruz argues that the presumption must be rebutted by clear and convincing evidence. (Pl.'s Mot. 11 (citing *In re Tawk Dev., LLC*, 2016 Bankr. LEXIS 4699 (2016)).) But *Schikore* does not require such a standard. *See* 269 F.3d at 964; *Piper*, 2021 WL 12368936, at *3; *In re Miranda*, 2021 Bankr. LEXIS 2311, *34. Further, even if a clear and convincing evidence standard applies, a reasonable jury could find UCB has met this burden. In either case, neither party is entitled to summary judgment.

*Agilent Techs., Inc.*, No. CIVS062234LKKKJM, 2008 WL 162166, at *5 (E.D. Cal. Jan. 17, 2008)). "[W]here the recipient presents evidence that the letter was not received, the opposing evidence must be weighed by the trier of fact to determine whether or not the letter was received." *Id.* (first citing *Rosenthal v. Walker,* 111 U.S. 185, 194 (1884); and then citing *Anderson v. United States*, 966 F.2d 487, 492 (9th Cir. 1992)); *see also Erwin v. Citibank, N.A.*, No. 316CV03040GPCKSC, 2017 WL 1047575, at *5 (S.D. Cal. Mar. 20, 2017) (same). Here, as outlined above, both sides have presented evidence weighing for and against delivery. Such evidence "must be weighed with all the other circumstances of the case, by the jury in determining the question whether the letters were actually received or not." *See Rosenthal*, 111 U.S. at 194. Because a genuine dispute of material fact exists as to whether the Letter was delivered, the Court denies summary judgment to both parties on Cruz's 15 U.S.C. § 1692c(a)(2) and Cal. Civ. Code § 1788.14(c) claims.

**2. Alleged Violations of 15 U.S.C. § 1692d(5) and Cal. Civ. Code § 1788.11(d), (e)**

The FDCPA also bars debt collectors from "engag[ing] in any conduct the natural consequence of which is to harass, oppress, or abuse any person in connection with the collection of a debt. 15 U.S.C. § 1692d. Specifically, debt collectors may not "[cause] a telephone to ring or engag[e] any person in telephone conversation repeatedly or continuously with intent to annoy, abuse, or harass any person at the called number." *Id.* § 1692d(5). Similarly, the RFDCPA prohibits debt collectors from collecting or attempting to collect covered debts by "[c]ausing a telephone to ring repeatedly or continuously to annoy the person called" or "[c]ommunicating, by telephone or in person, with the debtor with such frequency as to be unreasonable, and to constitute harassment of the debtor under the circumstances." Cal. Civ. Code § 1788.11(d), (e).

Intent can be inferred from circumstantial evidence, such as "the frequency of phone calls, the substance of the phone calls, or the place to which phone calls are made." *Kerwin v. Remittance Assistance Corp.*, 559 F. Supp. 2d 1117, 1124 (D. Nev. 2008). Under 12 C.F.R. § 1006.14(b)(2)(i), a debt collector enjoys a presumption of compliance with 15

U.S.C. § 1692d(5) if it does not call a particular person more than seven times within seven consecutive days. Conversely, a debt collector is presumed to violate 15 U.S.C. § 1692d(5) if it calls a particular person more than seven times within seven consecutive days. 12 C.F.R. § 1006.14(b)(2)(ii). The regulation's plain text and structure confirm that a call that a debtor places to a debt collector does not count toward the total. *See id.* § 1006.14(b)(2)(i). The regulation counts only calls "*the debt collector* places." *Id.* (emphasis added). And where the regulation intends to count calls initiated by either debtor or debt collector, it does so with specificity. *Compare id. with id.* § 1006.14(b)(2)(i) (counting telephone conversation with debtor regardless of initiating party) *and id.* § Pt. 1006, Supp. I ("[I]f a debt collector and a person discuss one particular debt during a telephone conversation, the debt collector has engaged in a telephone conversation in connection with the collection of the particular debt, regardless of which party initiated the discussion . . . .").

Both presumptions are rebuttable. Factors that may rebut the presumption of compliance include:

> [1] The frequency and pattern of telephone calls the debt collector places to a person, including the intervals between them. . . .
> [2] The frequency and pattern of any voicemails that the debt collector leaves for a person, including the intervals between them. . . .
> [3] The content of a person's prior communications with the debt collector. . . . Among the considerations relevant to this factor are whether the person previously informed the debt collector, for example, that the person did not wish to be contacted again about the particular debt . . . .

*Id.* § Pt. 1006, Supp. I.

Both parties treat Cruz's FDCPA and RFDCPA claims as rising and falling together based on the call volume standards in 12 C.F.R. § 1006.14(b)(2)(i). (*See* Pl.'s Mot. 14–16; Def.'s Mot. 10–14.) Cruz argues that he is entitled to summary judgment on both claims because UCB called him more than seven times within seven consecutive days, triggering the presumption of violation. (Pl.'s Mot. 14–16.) UCB argues that it is entitled to summary judgment because it did not call Cruz more than seven times within seven days, triggering

the presumption of compliance. (Def.'s Mot. 10–14.) For the reasons stated below, the Court denies summary judgment to both parties.

Cruz identifies several periods in which he alleges UCB called more than seven times within seven consecutive days. Cruz first counts eight calls from 10/25/23 – 10/31/23. (Pl.'s Mot. 14.) UCB's call log for this period shows seven outbound calls from UCB agents. (Ex. 12 Tiller Decl.) Cruz also counts a call marked "Inbound." (*See id.*) The other October and November periods Cruz identifies fare similarly, exceeding seven calls only by counting various calls logged as "Inbound."[7] (*Compare* Pl.'s Mot. 14 *with* Ex. 12 Tiller Decl.) Therefore, if "Inbound" means that Cruz called UCB, then UCB enjoys the presumption of compliance for the October and November periods. However, if "Inbound" still denotes UCB calling Cruz, then Cruz has established the presumption of violation for the October and November periods.

By its plain text, "Inbound" connotes incoming calls made to UCB. However, Velasco testified equivocally on this point. She testified that the log reflects "the calls made in an attempt to contact Mr. Cruz," and agreed that the log shows "all the calls made

---

[7] The call log lists calls to several different phone numbers throughout these periods. UCB argues that only those calls made to (619)-253-0095 count. (Def.'s Opp'n 10.) However, 12 C.F.R. § 1006.14(b) counts calls made "to a particular person" regardless of the number dialed. And a call need not reach the debtor to count; § 1006 excludes only calls that do not connect, regardless of whether the debtor was available at that number. *See id.* § 1006(b)(3)(ii). Velasco conceded that the call log reflects "all the calls made by UCB to Mr. Cruz." (Ex. 4 Tiller Decl. 81:8–12, ECF No. 37-7.) Supp. I to § Pt. 1006 provides that misdirected calls do not count only "[i]f, within a period of seven consecutive days, a debt collector attempts to communicate with a particular person by placing telephone calls to a particular telephone number, and the debt collector then learns that the telephone number is not that person's number." For example, if "a debt collector first attempts to communicate with a consumer on Monday, and again on Wednesday, by placing one unanswered telephone call to a particular telephone number on each of those days," and then "[o]n Thursday, the debt collector learns that the telephone number belongs to someone else and that the consumer does not answer telephone calls to that number," there would be zero calls for that seven-day period. *Id.* Even drawing all inferences in UCB's favor, the record before the Court does not support the idea that UCB learned that (619)-540-1390 or (619)-725-8000 were not Cruz's numbers within any of the seven-day periods at issue. UCB fails to identify when it learned that these were not Cruz's numbers and continued to call both numbers about Cruz's debt through December. (*See* Ex. 12 Tiller Decl.; Ex. 5 Tiller Decl. 77:7–78:3.) Therefore, the Court counts calls to these numbers in evaluating the parties' motions.

by UCB to Mr. Cruz." (Ex. 4 Tiller Decl. 81:3–12.) She also agreed that column A "is the telephone number dialed." (*Id.* at 82:12–14.) Defendants concede that Cruz's cellphone number is (619)-253-0095. (Def.'s Opp'n 10.) One of the "Inbound" calls at issue here, on October 27, 2023 at 2:11:43 p.m., shows Cruz's cellphone number in Column A, implying that it was the number *dialed*, not the number calling. (*See* Ex. 12 Tiller Decl.) Velasco also testified regarding an "Inbound Call" that "the phone number was dialed and the agent identified it as a wrong number, dialed." (*See* Ex. 4 Tiller Decl. 83:21–84:2.)[8] Drawing all inferences in Cruz's favor, as the Court must when evaluating UCB's motion for summary judgment, a reasonable jury could find that UCB placed "Inbound" calls. Therefore, UCB is not entitled to the presumption of compliance. The opposite holds true when drawing all inferences in *UCB's* favor. Therefore, neither party has established any presumption for the October and November periods.

Finally, relying on UCB's internal notes on his account, Cruz alleges UCB called him eight times from 12/5/23 – 12/11/23. (Pl.'s Mot. 15.) One of the account entries Cruz relies on is dated December 7, 2023, at 6:00 p.m., and is marked with the code "VWD LV." (Ex. 13 Tiller Decl., ECF No. 37-16.) Cruz alleges "VWD LV" means "voicemail attempt," but points to no evidence supporting his interpretation. (*See* Pl.'s Mot. 15.) UCB has introduced unrebutted evidence that "VWD LV" means "viewed" and does not reflect a call.[9] The call log is consistent with UCB's interpretation, as it does not reflect a call on

---

[8] Velasco discusses row 15 of the call log here. The first entry on the call log is row nine, (*see* Ex. 4 Tiller Decl. 82:6–9), so row 15 is the seventh entry on the call log—September 19, 2023, at 2:06:34 p.m.

[9] (*See* Def.'s Opp'n 11 (citing Decl. Michelle S. Velasco Supp. Def.'s Opp'n, ECF No. 42-1).) Cruz objects that Velasco's declaration is a sham affidavit because it contradicts her deposition testimony. (Pl.'s Reply 5–6.) But ¶¶ 8–9 of the declaration, on which the Court relies exclusively here, concern only the meaning of "VWD"—a topic never broached in the allegedly inconsistent portions of Velasco's deposition. (*See* Ex. 3 Flynn Decl. 74–88.) Therefore, ¶¶ 8–9 are consistent with Velasco's deposition. Even if other parts of the declaration are inconsistent, the sham affidavit rule would only apply to those inconsistent portions. *Cf. Van Asdale v. Int'l Game Tech.*, 577 F.3d 989, 998 (9th Cir. 2009) ("[T]he district court disregarded the portion of Shawn's declaration . . . because the district court viewed this portion of the declaration as contradicting Shawn's deposition testimony."). Cruz also argues that

December 7, 2023, at 6:00 p.m. (*See* Ex. 12 Tiller Decl.) And Velasco testified that she was not aware of any calls from UCB to Cruz missing from the log. (Ex. 4 Tiller Decl. 81:14–16.) Therefore, for this period only, UCB enjoys the presumption of compliance.

However, even for the December period, Cruz has still established a triable issue of fact. As outlined above, the presumption is rebuttable, and UCB concedes that "[w]hether the person previously told the debt collector not to call again . . . or sent a cease-and-desist notice under § 1006.6(c) is highly relevant" to rebuttal. (Def.'s Mot. 13 (citing 12 C.F.R. § Pt. 1006, Supp. I).) As discussed above, Cruz sent UCB a "Cease and Desist Letter" on October 5, 2023, instructing UCB to "end all further creditor communication with" him. The Court finds that receipt of the Letter is genuinely disputed. Part III.A.1.b, *supra*. If Cruz can establish that UCB received the Letter, then he would likely be able to rebut the presumption for any subsequent call period, as the Letter would be highly relevant. (*See* Def.'s Mot. 13 (citing 12 C.F.R. § Pt. 1006, Supp. I).) Therefore, for the reasons stated above, the Court denies summary judgment to both parties on Cruz's 15 U.S.C. § 1692d(5) and Cal. Civ. Code § 1788.11(d), (e) claims.[10]

**3. Bona Fide Error Affirmative Defense**

UCB argues that even if it violated the FDCPA or the RFDCPA, it is entitled to summary judgment on the bona fide error affirmative defense. (Def.'s Mot. 20–23.) Cruz argues that UCB waived the bona fide error defense to the RFDCPA. (Pl.'s Opp'n 20–24.) He argues in the alternative that UCB has not established the defense under either the

---

"[f]ailure to supplement interrogatory responses after the deposition, or to ever define these codes in any pre-MSJ document bars their introduction now per FRCP 37(c)(1)." (Pl.'s Reply 6.) Rule 37(c)(1) bars parties from using information to support a motion if they failed to provide that information as required by Rule 26(a) or (e). UCB had no Rule 26(a) duty to define "VWD." And UCB had no Rule 26(e) duty to supplement interrogatory responses or define "VWD LV" when neither the interrogatories nor the deposition asked about the topic. (*See* Ex. 2–3, 7 Flynn Decl.) UCB had no reason to disclose the meaning of "VWD LV" until they saw that Cruz had suggested a meaning in his motion for summary judgment. (*See* Pl.'s Mot. 15.)

[10] UCB argues that the Court cannot grant summary judgment to Cruz on his Cal. Civ. Code § 1788.11(e) claim because Cruz did not allege it in his Complaint. (Def.'s Opp'n 9.) The Court need not decide this issue, however, because Cruz is not entitled to summary judgment on the § 1788.11(e) claim either way.

FDCPA or the RFDCPA. (*Id.* at 24–25.) For the reasons stated below, the Court finds UCB did not waive the bona fide error defense to the RFDCPA. Further, the Court denies summary judgment to UCB on the bona fide error defense to Cruz's FDCPA and RFDCPA claims.

The FDCPA is a strict liability statute. *Reichert v. Nat'l Credit Sys., Inc.*, 531 F.3d 1002, 1005 (9th Cir. 2008). However, the FDCPA provides a narrow exception to strict liability for bona fide errors. *Id.* (citing *Clark v. Cap. Credit & Collection Servs., Inc.*, 460 F.3d 1162, 1176 n.11 (9th Cir. 2006)). A debt collector may not be liable if it "shows by a preponderance of evidence that the violation was not intentional and resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adapted to avoid any such error." 15 U.S.C. § 1692k(c). The defense "requires a showing that the debt collector: (1) violated the FDCPA unintentionally; (2) the violation resulted from a bona fide error; and (3) the debt collector maintained procedures reasonably adapted to avoid the violation." *Urbina v. Nat'l Bus. Factors Inc.*, 979 F.3d 758, 763 (9th Cir. 2020) (citing *McCollough v. Johnson, Rodenburg & Lauinger, LLC*, 637 F.3d 939, 948 (9th Cir. 2011)).

The RFDCPA has a similar defense, which is nearly identical textually except that it omits the "bona fide error" element. *Compare* Cal. Civ. Code § 1788.30(e) *with* 15 U.S.C. § 1692k(c). The RFDCPA provides that a debt collector "shall have no civil liability . . . for a violation of this title, if the debt collector shows by a preponderance of evidence that the violation was not intentional and resulted notwithstanding the maintenance of procedures reasonably adapted to avoid any such violation." Cal. Civ. Code § 1788.30(e). The two defenses are "similar," and in construing the RFDCPA, the California Court of Appeal recently noted that "state courts commonly find federal court interpretations of federal laws that use similar language to be persuasive authority." *Velocity Invs., LLC v. Nguyen*, No. C102846, 2026 WL 2542811, at *6 (Cal. Ct. App. Aug. 28, 2026) (citing *Raines v. U.S. Healthworks Med. Grp.*, 15 Cal. 5th 268, 282 (2023)). Accordingly, the California Court of Appeal consulted federal cases construing the FDCPA as persuasive authority in construing the RFDCPA's parallel defense. *See id.* (first citing

*Wilhelm v. Credico, Inc.*, 519 F.3d 416, 421 (8th Cir. 2008); and then citing *Welker v. L. Off. of Daniel J. Horwitz*, 699 F. Supp. 2d 1164, 1171 (S.D. Cal. 2010)). Given this background and the fact that the defenses use near-identical language, the Court analyzes them together.

**a. Waiver of the RFDCPA's Bona Fide Error Defense**

Cruz argues that UCB waived the RFDCPA's bona fide error defense by not pleading it in UCB's Answer. (Pl.'s Reply 8–9.) The Court disagrees. "The Ninth Circuit has liberal pleading standards and as long as the plaintiff is not prejudiced, affirmative defenses that were not pleaded in an answer may be raised for the first time on summary judgment." *E.g.*, *Aponte v. Mason Cnty. Fire Prot. Dist. No 16*, 641 F. Supp. 3d 1016, 1024 (W.D. Wash. 2022) (citation modified). The question is one of fair notice. *Wyshak v. City Nat'l Bank*, 607 F.2d 824, 827 (9th Cir. 1979). The party claiming waiver "must point to a 'tangible way in which it was prejudiced by the delay.'" *Garcia v. Salvation Army*, 918 F.3d 997, 1009 (9th Cir. 2019) (quoting *Ledo Fin. Corp. v. Summers*, 122 F.3d 825, 827 (9th Cir. 1997)).

Cruz claims that "[h]ad UCB pleaded § 1788.30(e), Plaintiff would have served targeted discovery and noticed RFDCPA-specific 30(b)(6) topics on UCB's California-specific compliance procedures, RFDCPA training, license-disclosure procedures, complaint-handling and audit records, and prior California enforcement history." (Pl.'s Reply 9.) The record contradicts Cruz's claimed prejudice. Cruz *did* serve targeted discovery on UCB about the RFDCPA. (Ex. 7 Flynn Decl. 9 (emphasis added) ("For Your affirmative defense of bona fide error asserted in Your Answer Describe in detail the error(s) alleged, why it was unintentional, and the procedures You maintain that are reasonably adapted to avoid such errors, including training programs, audits, and compliance monitoring related to FDCPA, *RFDCPA*, and TCPA.") (emphasis added); Ex. 6 Flynn Decl. 8 (emphasis added) ("Admit that Your alleged failure to cease communications with Plaintiff after receipt of the Cease-and-Desist Letter was not the result of a bona fide error as defined by 15 U.S.C. § 1692k(c) *and Cal. Civ. Code §*

*1788.30(e)*.")) Cruz's 1788.30(e)-specific discovery is at odds with his claim of being "ambush[ed] at summary judgment" with the defense. (*See* Pl.'s Reply 9.)

Cruz's claim of prejudice is further undercut by the fact that UCB pled the FDCPA's bona fide error defense in its Answer. (*See id.*) Cruz claims that "[t]he bona fide error defenses under the FDCPA and the RFDCPA are not co-extensive" and that "[t]he Rosenthal Act's defense, as construed by California courts, contains its own elements, its own evidentiary contours, and its own procedural framework." (Pl.'s Opp'n 22–23.) But he cites no case law supporting this proposition. (*Id.*) Nor could he; as outlined above, the FDCPA and RFDCPA's bona fide error defenses are functionally identical, and courts treat them as such. Therefore, UCB's Answer put Cruz on notice of the same defense UCB now asserts at summary judgment.

For the reasons stated above, the Court finds that Cruz received fair notice that UCB would assert the RFDCPA's bona fide error defense and is not prejudiced by its assertion now at summary judgment. Therefore, the Court finds that UCB did not waive the RFDCPA's bona fide error defense by not pleading it in UCB's Answer.

**b. Bona Fide Error Defense to Alleged FDCPA and RFDCPA Violations**

The first element of the bona fide error defense requires the defendant to show that the violation was unintentional. *Welker v. L. Off. of Daniel J. Horwitz*, 699 F. Supp. 2d 1164, 1171 (S.D. Cal. 2010) (citations omitted). "This inquiry is inherently subjective and 'becomes principally a credibility question' as to whether the defendant intended to violate the FDCPA."[11] Where the record indicates that a defendant "explicitly denied any intent

---

[11] *Id.* (quoting *Johnson v. Riddle*, 443 F.3d 723, 729 (10th Cir. 2006)). However, note that "the case law is somewhat unsettled as to what makes a violation intentional; that is, whether it is the general intent to collect a debt or whether it is the specific intent to violate the FDCPA." *Johnson*, 443 F.3d at 728 (citation modified) (collecting cases). For example, in *Johnson v. Riddle*, the Tenth Circuit read "not intentional" in 15 U.S.C. § 1692k to mean that the debt collector lacked the specific intent to violate the FDCPA. *Id.* at 728–29. The Supreme Court seemed to reject this reading in *Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA*. *See* 559 U.S. 573, 586 (2010) ("Our law is therefore no stranger to the possibility that an act may be 'intentional' for purposes of civil liability, even if the actor lacked actual knowledge that her

to violate the FDCPA, subjective intent can often only be shown by inferential evidence." *Johnson v. Riddle*, 443 F.3d 723, 728 (10th Cir. 2006) (citation omitted). Therefore, the extent to which a defendant "should have objectively realized that his actions were in violation of law may be inferentially probative of the subjective intentional nature of that violation." *Id.* at 729.

Here, a reasonable jury could infer that UCB subjectively intended to violate the FDCPA and RFDCPA. As explained in Part III.A.1.b, *supra*, a reasonable jury could find that UCB received and processed the Letter. The Letter repeatedly said that continuing to contact Cruz following receipt would violate the FDCPA and RFDCPA. (Ex. 7 Tiller Decl. ("Since you have now been formally noticed as required by law, any future communications in any form with our Client, without express written consent will constitute *willful violations of either the FDCPA and/or the RFDCPA* . . .").) A reasonable jury could find that UCB, after having received and processed the Letter, intended to violate the FDCPA and RFDCPA, especially given that Cruz's counsel notified UCB that

---

conduct violated the law."); *id.* at 602 ("The dissent's reading also invites litigation about a debt collector's subjective intent to violate the FDCPA."). *But see id.* at 620 (Kennedy, J., dissenting) ("The Court . . . suggests that reading § 1692k(c) to include legal errors would encourage litigation over . . . what subjective intent is necessary for liability . . . . Yet these questions are no different from ones already raised by the statute. . . . [S]ubjective intent must be assessed before liability can be determined."). The Ninth Circuit seemed to follow *Jerman* in rejecting *Johnson*'s specific intent requirement in *Evon v. L. Offs. of Sidney Mickell*. *See* 688 F.3d 1015 (2012). Without discussing any specific intent to violate the FDCPA, the *Evon* panel held that the defendant was not entitled to the bona fide error defense as a matter of law in part because he "intentionally sent letters to the workplaces of putative class members." *Id.* at 1030–31. However, *Jerman* could be read more narrowly to be limited to the mistake-of-law context it arose in. *Cf. Kaiser v. Cascade Cap., LLC*, 989 F.3d 1127, 1137–40 (9th Cir. 2021) (holding that mistakes about the state-law statute of limitations applicable to a debt could be bona fide errors). *But see Jerman*, 559 U.S. at 620 (Kennedy, J., dissenting) ("The Court provides no reason to think that legal errors raise concerns that differ in these respects from those raised by nonlegal errors."). Further, the Ninth Circuit continues to favorably cite *Johnson*'s reading of "not intentional" in 15 U.S.C. § 1692k. *Huffman v. JP Morgan Chase Bank, N.A.*, No. 24-5653, 2026 WL 396536, at *1 (9th Cir. Feb. 12, 2026) (quoting *Johnson*, 443 F.3d at 728–29) ("[The] bona fide error defense has a 'subjective' and 'objective' reasonableness component."). The Court need not resolve this confusion, however. As outlined below, a reasonable jury could find that UCB failed to establish the first element of the bona fide error defense even under *Johnson*'s more defendant-friendly mens rea standard.

further contact would constitute *willful* FDCPA and RFDCPA violations. *See id.*; *Johnson*, 443 F.3d at 729.

Therefore, UCB has failed to show that there is no dispute of material fact as to whether its alleged violations of the FDCPA and RFDCPA were unintentional. Accordingly, the Court denies summary judgment on UCB's bona fide error defense to Cruz's FDCPA and RFDCPA claims.

**B. Alleged TCPA Violations**

Cruz's third Cause of Action alleges that UCB violated the TCPA. (Compl. ¶¶ 70–75.) The TCPA makes it unlawful, absent an emergency or the prior express consent of the called party, to use an automatic telephone dialing system ("ATDS") or an artificial or prerecorded voice to call a number assigned to a cellular telephone service. 47 U.S.C. § 227(b)(1)(A). Cruz alleges that UCB used both an ATDS and an artificial or prerecorded voice to call him. (Compl. ¶¶ 42, 45–52.) The ATDS and artificial or prerecorded voice prongs of the TCPA are independent theories of liability. *See Trim v. Reward Zone USA LLC*, 76 F.4th 1157, 1160 (9th Cir. 2023). UCB moved for summary judgment on both the ATDS and artificial or prerecorded voice theories of Cruz's TCPA claims. (Def.'s Mot. 16–20.) Cruz only moved for partial summary judgment on whether UCB called his phone and did so after he had revoked his prior consent. (Pl.'s Mot 18; Pl.'s Reply 8.) For the reasons stated below, UCB is entitled to summary judgment on the ATDS prong but not the artificial or prerecorded voice prong of Cruz's TCPA claims. Cruz's motion for partial summary judgment is granted in part and denied in part.

**1. Alleged ATDS Use**

The TCPA defines an ATDS as "equipment which has the capacity — (A) to store or produce telephone numbers to be called, *using a random or sequential number generator*; and (B) to dial such numbers." 47 U.S.C. § 227(a)(1) (emphasis added). In *Facebook, Inc. v. Duguid*, 592 U.S. 395 (2021), the Supreme Court held that to qualify as an ATDS, "a device must have the capacity either to store a telephone number using a random or sequential generator or to produce a telephone number using a random or

sequential number generator." *Id.* at 399. The Ninth Circuit has held that post-*Duguid*, an ATDS "must generate and dial random or sequential *telephone* numbers under the TCPA's plain text." *Borden v. eFinancial, LLC*, 53 F.4th 1230, 1231 (9th Cir. 2022) (emphasis in original). Therefore, equipment that merely dials from a list of telephone numbers the caller already has is not an ATDS, even if a number generator orders the list. *Id.* at 1233–36; *see also Brickman v. United States*, 56 F.4th 688 (9th Cir. 2022) (following *Borden* on similar facts).

Here, UCB uses a system called LiveVox HCI. (Velasco Decl. ¶ 10.) Cruz offers no evidence to rebut UCB's use of LiveVox HCI, saying only that Velasco's supporting declaration is "self-serving." (Pl.'s Separate Resp. Def.'s Statement Undisputed Material Facts 4.) Such "[c]onclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact." *See, e.g.*, *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). Therefore, the Court finds that UCB uses LiveVox HCI.

Post-*Duguid*, Cruz concedes that "the ATDS prong . . . is generally a difficult one for plaintiffs in LiveVox HCI cases." (Pl.'s Opp'n 19.) That is because LiveVox HCI lacks a random or sequential telephone number generator. (*See* Velasco Decl. ¶ 11.) Cruz essentially concedes this fact, citing no materials in the record to dispute it. (*See* Pl.'s Separate Resp. Def.'s Statement Undisputed Material Facts 5.) He offers only the conclusory statement that whether LiveVox HCI has a random or sequential telephone number generator is "[n]ot material to the prerecorded-voice prong of the TCPA." (*Id.*) The prerecorded-voice prong of the TCPA is irrelevant to whether LiveVox HCI has a random or sequential telephone number generator. Accordingly, it is undisputed that LiveVox HCI lacks a random or sequential telephone number generator. Instead, LiveVox HCI "either: 1) presents numbers from a list provided by UCB, in an order based on criteria provided by UCB, to a UCB employee who then initiates the call; or, 2) an agent may select a number from the account and initiate the call through the System." (Velasco Decl. ¶ 11.)

As LiveVox HCI lacks a random or sequential telephone number generator, it is not an ATDS under the TCPA. *See Borden*, 53 F.4th at 1233–36; *Brickman*, 56 F.4th 688; *see also Meier v. Allied Interstate LLC*, No. 20-55286, 2022 WL 171933, at *2 (9th Cir. Jan. 19, 2022) ("[T]he HCI dialer does not qualify as an ATDS."). Therefore, UCB has shown that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law on the ATDS prong of Cruz's TCPA claims.

**2. Alleged Use of Artificial or Prerecorded Voice**

**a. Evidentiary Objection**

UCB moves to strike as a sham paragraphs eight and nine of Cruz's supplemental declaration in support of his opposition to UCB's motion for summary judgment, ECF No. 46-1. (Def.'s Reply 7–8.) For the reasons stated below, the Court declines to do so.

"The general rule in the Ninth Circuit is that a party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony." *Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262, 266 (9th Cir. 1991) (citations omitted). But this rule "should be applied with caution." *School Dist. No. 1J, Multnomah Cnty., Or. v. ACandS, Inc.*, 5 F.3d 1255, 1264 (9th Cir. 1993). That is because the sham affidavit rule "is in tension with the principle that a court's role in deciding a summary judgment motion is not to make credibility determinations or weigh conflicting evidence." *Van Asdale v. Int'l Game Tech.*, 577 F.3d 989, 998 (9th Cir. 2009). Further, "[a]ggressive invocation of the rule . . . threatens to ensnare parties who may have simply been confused during their deposition testimony and may encourage gamesmanship by opposing attorneys." *Id.*

Accordingly, the Ninth Circuit has placed two "important limitations" on a district court's discretion to invoke the sham affidavit rule. *Id.* First, "the rule does not automatically dispose of every case in which a contradictory affidavit is introduced to explain portions of earlier deposition testimony; rather, the district court must make a factual determination that the contradiction was actually a 'sham.'" *Id.* (citation modified). Second, "the inconsistency between a party's deposition testimony and subsequent affidavit must be clear and unambiguous to justify striking the affidavit." *Id.* at 998–99.

"The non-moving party is not precluded from elaborating upon, explaining or clarifying prior testimony elicited by opposing counsel on deposition, and minor inconsistencies that result from an honest discrepancy, a mistake, or newly discovered evidence afford no basis for excluding an opposition affidavit." *Id.* (citation modified).

There is no clear and unambiguous inconsistency between Cruz's deposition testimony and later declaration. Cruz testified repeatedly at his deposition that he received UCB calls that were not from live individuals. (*E.g.*, Ex. 1 Flynn Decl. 76:12–18 ("[N]one of them were live individuals . . . ."); *id.* at 77:7–9 ("Again, it was never a live person. It was always a quick little pause, and then whatever, a track or whatever would start."); *id.* at 79:17–18 ("[I]t was never a live person because the few calls that I did answer was never a live person.").) Paragraphs eight and nine of Cruz's declaration support this deposition testimony rather than contradict it. (*See* Suppl. Decl. Jesus A. Cruz, Jr. Supp. Pl.'s Opp'n ("[W]hen I answered calls from UCB, there would be a pause or delay before anyone came on the line . . . Many of the calls I answered had noticeable pauses or delays and sounded robotic or prerecorded in nature.").)[12]

UCB's alleged inconsistencies are unavailing here. Cruz conceded at his deposition that it was "*possible* that none of the phone calls from UCB were automated calls." (Ex. 1 Flynn Decl. 76:22–25 (emphasis added).) But Cruz merely acknowledging this possibility does not clearly and unambiguously contradict paragraphs eight and nine of his declaration, where he asserted his belief that UCB used an artificial or prerecorded voice to call him (as he asserted repeatedly throughout his deposition). A witness who concedes that he *might* be mistaken has not conceded that he *is* mistaken. *Cf. Doan v. United States*, 202 F.2d 674, 680 (9th Cir. 1953) ("It [is] for the jury . . . to say whether the quoted statement . . .

---

[12] Cruz's repeated assertions to this effect support a finding that he had personal knowledge of the matter; whether something "sounded" robotic or prerecorded is "knowledge produced by the direct involvement of the senses." *Cf. Chevron Env't Mgmt. Co. v. Env't Prot. Corp.*, 335 F.R.D. 316, 324 (E.D. Cal. 2020) (quoting *United States v. Lopez*, 762 F.3d 852, 863 (9th Cir. 2014)). (*Contra* Def.'s Reply Pl.'s Separate Resp. Def.'s Statement Undisputed Material Facts 7.)

amounted . . . to a withdrawal of his direct testimony, or whether it was simply the kind of statement which any honest witness might make,[] that it was no more than an admission that he could be mistaken . . . .”).

Similarly, UCB argues that paragraphs eight and nine are a sham because “Plaintiff also testified that as of 2023/2024, it was his practice to hang up on a call if there was any pause after answering a call such that he was never on the line long enough to hear if the call was using an artificial or prerecorded voice.” (Def.’s Reply 8 (citing Ex. 1 Flynn Decl. 78:11–79:14).) But in the cited part of Cruz’s deposition transcript, Cruz qualified his remarks, saying, “I mean, I can just tell you the information that I recall from the calls that I did answer. So, I’m sorry that I can’t be more detailed or get more technical responses. I just remember what I remember.” (Ex. 1 Flynn Decl. 79:10–14.) At most, Cruz’s testimony is equivocal as to whether he routinely hung up calls before he could hear whether the caller was using an artificial or prerecorded voice, but it is not clearly and unambiguously inconsistent with his declaration. (*See id.*)

UCB also points to *Yeager v. Bowlin* in support of its evidentiary objection. (Def.’s Reply 8–9 (citing 693 F.3d 1076, 1080 (9th Cir. 2012)).) *Yeager* held that the district court didn’t abuse its discretion in declaring a declaration to be a sham affidavit where the declarant had responded at his deposition that he didn’t recall answers to approximately *one hundred and eighty five different questions*, then “suddenly recall[ed] those same events with perfect clarity in his declaration in opposition to summary judgment.” 693 F.3d at 1080 (alteration in original) (emphasis added). Further, the declarant in *Yeager* provided no explanation for his newfound recollection other than having “reviewed several documents” since the deposition. *Id.* “The district court found this explanation to be ‘unbelievable given that Yeager was shown over twenty exhibits during his deposition in an attempt to refresh his recollection.’” *Id.*

*Yeager* is inapposite here. Unlike *Yeager*, where the declarant repeatedly asserted he could not remember questions that went “to the heart of [the] action” and “refused to answer hundreds of material questions,” Cruz repeatedly testified at his deposition that he

remembered UCB calls using an artificial or prerecorded voice. *Compare Yeager*, No. CIV. 2:08-102WBSJFM, 2010 WL 95242, at *4 (E.D. Cal. Jan. 6, 2010) *with* Ex. 1 Flynn Decl. 76:12–18 ("[N]one of them were live individuals . . . .") *and id.* at 77:7–9 ("Again, it was never a live person. It was always a quick little pause, and then whatever, a track or whatever would start.") *and id.* at 79:17–18 ("[I]t was never a live person because the few calls that I did answer was never a live person."). It is true that Cruz's testimony was equivocal at times, and he professed to memory gaps. (*See, e.g.*, Ex. 1 Flynn Decl. 79:10–14.) But unlike *Yeager*, even where Cruz's memory was imperfect, he held to remembering the key facts rather than refusing to answer. (*Compare Yeager*, 2010 WL 95242, at *4 *with* Ex. 1 Flynn Decl. 79:10–14 (emphasis added) ("I mean, I can just tell you *the information that I recall* from the calls that I did answer. So, I'm sorry that I can't be more detailed or get more technical responses. *I just remember what I remember*.").)

As there is no clear and unambiguous inconsistency between Cruz's deposition testimony and later declaration, the Court declines to find that paragraphs eight and nine are a sham. Accordingly, Cruz's declaration is considered in full in evaluating the parties' motions for summary judgment.

**b. Analysis**

The TCPA's artificial or prerecorded voice prong, 47 U.S.C. § 227(b)(1)(A), encompasses only "audible sounds." *Trim v. Reward Zone USA LLC*, 76 F.4th 1157, 1161 (9th Cir. 2023). Further, § 227(b)(1)(A) regulates "only the manner in which a call is made or initiated." *Howard v. Republican Nat'l Comm.*, 164 F.4th 1119, 1127 (9th Cir. 2026). For example, "a call that is *begun* with an artificial or prerecorded voice" or "a voicemail message that consists of a prerecorded robocall, rather than a recording of a live speaker contemporaneously leaving a message" would each violate § 227(b)(1)(A) if the listener was "involuntarily subjected to the nuisance of listening to an artificial or prerecorded voice." *Id.* (emphasis in original). Conversely, a live caller asking the recipient "if he or she is willing to listen to a prerecorded message or is willing to complete an automated survey" once a call had already begun would not violate § 227(b)(1)(A). *Id.* at 1127.

Here, Velasco declared that Cruz had a Citibank account and that "UCB's policy is to not use artificial or prerecorded voices for Citibank accounts." (Velasco Decl. ¶ 12.) She further stated that, having "reviewed the account notes and the call recordings for [Cruz's] account," she was "certain that no prerecorded or artificial voices were used in connection with [his] account." (*Id.* ¶ 13.) Velasco testified to similar effect at her deposition. (*See, e.g.*, Ex. 2 Flynn Decl. 107:20–108:12.)

In opposing summary judgment, Cruz submitted a declaration that the calls he answered from UCB were "identical in nature, possessed the same cadence, content, and were clearly not calls manually dialed by a live agent, but prerecorded automated voice messages." (Suppl. Decl. Jesus A. Cruz, Jr. Supp. Pl.'s Opp'n ¶ 8.) Cruz also described other indicia of artificial or prerecorded voice, including that he received voicemail messages that "appeared to be identical or substantially similar scripted messages" and that many of the calls he answered "had noticeable pauses or delays and sounded robotic or prerecorded in nature." (*Id.* ¶¶ 8–9.)

Cruz's declaration and deposition testimony establish a genuine dispute of material fact. The Ninth Circuit has held that a party's declaration and deposition testimony, "albeit uncorroborated and self-serving," can be "sufficient to establish a genuine dispute of material fact" where they are "based on personal knowledge, legally relevant, and internally consistent." *Nigro v. Sears, Roebuck & Co.*, 784 F.3d 495, 497 (9th Cir. 2015). "Declarations are often self-serving, and this is properly so because the party submitting it would use the declaration to support his position," and a court "may not disregard a piece of evidence at the summary judgment stage solely based on its self-serving nature." *Id.* (citing *S.E.C. v. Phan*, 500 F.3d 895, 909 (9th Cir. 2007)). Cruz's personal observations as to how calls sounded are based on his personal knowledge, and whether UCB used an artificial or prerecorded voice is plainly legally relevant. Further, as described above in rejecting UCB's sham affidavit objection, the Court finds that Cruz's declaration and deposition testimony are internally consistent. Cruz repeatedly described hearing indicia of artificial or prerecorded voice.

Therefore, Cruz's declaration and deposition testimony establish a genuine dispute of material fact. For example, a reasonable jury could infer that what Cruz heard means UCB used artificial or prerecorded voice, and discredit the testimony of Velasco, a UCB employee. This is especially so given that Velasco did not listen to every call UCB placed to Cruz, could not say whether LiveVox can leave prerecorded messages, and acknowledged that UCB uses prerecorded voice messages on other accounts. (Ex. 2 Flynn Decl. 75:7–13 (stating that Velasco listened to only some of the call recordings between UCB and Cruz); Ex. 3 Flynn Decl. 84:6–7 (stating that there were 39 calls for which UCB lacks a recording); *id.* at 75:3–76:4; Ex. 2 Flynn Decl. at 104:15–18 (stating that UCB uses prerecorded voice messages on other accounts).)

UCB points to *Wofford v. Portfolio Recovery Assocs. LLC* in support of its motion for summary judgment. (Def.'s Mot. 20 (citing 24-CV-07509-RFL, 2026 WL 124312, at *1 (N.D. Cal. Jan. 16, 2026)).) The district court in *Wofford* granted summary judgment against a TCPA plaintiff on the artificial or prerecorded voice prong. 2026 WL 124312, at *2. But *Wofford* is distinguishable. In opposing summary judgment, the *Wofford* plaintiff offered only the bare, conclusory statement that she "[r]ecalled prerecorded messages." *Id.* (alteration in original). Unlike Cruz, she failed to bolster her assertion by identifying the indicia of artificial or prerecorded voice that led her to believe the messages she heard were prerecorded. *See id.* Further, the *Wofford* defendant offered evidence that its LiveVox systems were incapable of using an artificial or prerecorded voice. *Id.* Here, UCB offered no such evidence. In fact, as noted above, Velasco could not say whether UCB's LiveVox configuration can leave prerecorded messages and acknowledged that UCB uses prerecorded voice messages on other accounts.

Therefore, the Court finds a triable question of fact exists as to whether UCB used an artificial or prerecorded voice and denies summary judgment to UCB on this prong of Cruz's TCPA claims. The Court now turns to the remaining elements of the artificial or prerecorded voice prong, on which Cruz moves for partial summary judgment. First, "there is no dispute calls were placed to Plaintiff's cellular telephone." (Def.'s Mot. 17.)

Accordingly, the Court grants summary judgment to Cruz on whether UCB called his cellular telephone number within the meaning of the TCPA.

Second, Cruz asks the Court to summarily adjudicate whether "[t]he October 5, 2023, Letter expressly revoked 'any prior consent to be contacted by phone, text, or other method, including but not limited to calls with a pre-recorded or automated voice message." (Pl.'s Mot. 18.) Express consent is not an element of a plaintiff's prima facie TCPA case; rather, it is an affirmative defense for which the defendant bears the burden of proof. *Van Patten v. Vertical Fitness Grp*., LLC, 847 F.3d 1037, 1044 (9th Cir. 2017) (citations omitted). As outlined above, receipt of the Letter is genuinely disputed. *See supra* Part III.A.1.b. Therefore, the Court denies summary judgment to Cruz as to whether "[t]he October 5, 2023, Letter expressly revoked 'any prior consent to be contacted by phone, text, or other method, including but not limited to calls with a pre-recorded or automated voice message." (*See* Pl.'s Mot. 18.)

## IV. CONCLUSION AND ORDER

For the reasons stated above, Cruz's motion for partial summary adjudication is granted in part and denied in part. UCB's motion for summary judgment is granted in part and denied in part.

**IT IS SO ORDERED.**

Dated: October 13, 2026

Hon. Dana M. Sabraw
United States District Judge